SHAQUON CARTER,                      :
    Plaintiff,                   :
                            :
                            :     Civil Action No.
                            :     3:14-CV-01553 (VLB)
    v.                            :
                            :     May 15, 2017
DR. REVINE, et al.,                  :
    Defendant.                    :

**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION FOR LEAVE TO AMEND AMENDED COMPLAINT [DKTS. 45 & 52]**

Plaintiff Shaquon Carter ("Carter"), an individual incarcerated by the Connecticut Department of Correction ("DOC"), seeks monetary damages for purported Eighth Amendment violations relating to Defendants' failure to facilitate and provide him with medical treatment of his fractured thumb while he was located in the Restrictive Housing Unit ("RHU") for twelve days. The current named Defendants are Dr. Revine, Captain James Watson ("Watson"), Deputy Warden Denise Walker ("Walker"), Lieutenant Julie Stewart ("Stewart"), Captain Edward Guzman ("Guzman"), Lieutenant Mauvinchi, Lieutenant Scott Hadlock ("Hadlock"), and Jane Does 1-7 (collectively, "Defendants"). Presently before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Motion to Amend the Second Amended Complaint contingent upon the Court's summary judgment ruling. For the reasons stated herein, the Court DENIES in part and GRANTS in part Defendants' Motion for Summary Judgment and GRANTS Plaintiff's Motion to Amend the Second Amended Complaint.

## BACKGROUND

### I.    Relevant Procedural History

Carter filed his initial Complaint *pro se* on October 20, 2014, bringing claims of lost property, excessive force, deliberate indifference to personal safety, and deliberate indifference to serious medical needs. [*See* Dkt. 1 (Compl.)]. On October 2, 2015, counsel entered an appearance on Carter's behalf. [*See* Dkt. 9 (Pignatiello Notice of Appearance)]. Four days later, the Court entered its Initial Review Order allowing claims against Defendants Revine, Watson, Walker, and Guzman to proceed and granting leave to amend the complaint to plausibly allege claims for deprivation of property, excessive force, and deliberate indifference to his safety; identify how the remaining two Defendants acted with deliberate indifference to his serious medical needs; and name any new Defendants who also may have been involved by who are not specifically named in the caption. [*See* Dkt. 12 (Initial Review Order), at 1]. Counsel timely filed the Amended Complaint on November 9, 2015. [*See* Dkt. 17 (Am. Compl.)].

On January 15, 2016, Defendants filed a Motion to Dismiss the Amended Complaint in part, pursuant to Fed. R. Civ. P. 16(b)(1) and 12(b)(6). [*See* Dkt. 26-1 (Mot. Dismiss)]. Upon direction by the Court, Defendants re-filed the Motion to Dismiss to comport with the Court's Chambers Practices. [*See* Dkt. 28 (Order); Dkt. 29 (Am. Mot. Dismiss)]. Specifically, Defendants argued (1) the Court lacked subject matter jurisdiction over all claims brought against Defendants in their official capacities; and (2) the Amended Complaint failed to state a claim for (a)

intentional infliction of emotional distress against all Defendants, and (b) deliberate indifference to a serious medical need against Dr. Revine. *Id.* at 2. Defendants did not challenge Carter's claim for money damages alleging deliberate indifference to serious medical needs against Defendants Watson, Walker, Guzman, Stewart, Mauvinchi, Hadlock, and Jane Does 1-7. *Id.* at 4. On February 9, 2016, the Court granted in part and denied in part the Amended Motion to Dismiss, dismissing only the claims against Defendants in their official capacities. [*See* Dkt. 31 (Order)].

By leave of the Court, Carter amended his complaint a second time on February 24, 2016, to remove the claims against Defendants in their official capacities. [*See* Dkt. 36 (Second Am. Compl.)]. This Second Amended Complaint is now the operative complaint and names as Defendants Revine, Watson, Walker, Guzman, Stewart, Mauvinchi, Hadlock, and Jane Does 1-7 in their official capacities only. Defendants filed the Answer on March 8, 2016. [*See* Dkt. 38 (Answer)].

In compliance with the Court's operative Scheduling Order, [Dkt. 43 (Am. Scheduling Order)], Defendants filed the Motion for Summary Judgment on October 3, 2016. [Dkt. 45-1 (Mot. Summ. J.)]. First, Defendants argue that summary judgment should be granted as to Jane Does 1-7 because Carter never submitted a discovery request for their identities. *Id.* at 6. Second, Defendants argue summary judgment should be granted as to Dr. Revine and Lt. Mauvinchi because there is no record of their employment and they have not been served. *Id.* at 6-7. Third, Defendants argue summary judgment is warranted as to all other Defendants because Carter failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act and Administrative Directives 8.9 and 9.6. *See id.* at

7-9. Carter filed his Objection to the Motion for Summary Judgment on November 3, 2016. [Dkt. 51-1 (Opp'n Mot. Dismiss)].

On the same day Carter also filed a Motion to Amend the Amended Complaint contingent upon the Court denying Defendant's Motion for Summary Judgment. *See id.*; Dkt. 52 (Second Mot. Amend)]. Specifically, Carter requests leave to amend the Second Amended Complaint to correctly identify three Defendants and make the following changes: (1) Dr. Revine to Dr. Ruez, (2) Lt. Mauvinchi to Lt. Matuszczak, and (3) Jane Doe 1 to Cheryl Estrom. [Dkt. 52, at 1-2]. Carter also requests leave to remove Jane Does 2-7. *Id.* at 2.

Both the Motion for Summary Judgment and the Motion for Leave to Amend the Amended Complaint are now fully briefed. Below the Court first addresses the Motion for Summary Judgment as the Motion for Leave to Amend is dependent upon its outcome.

II.  Facts

On October 20, 2005, Carter was admitted to Manson Youth Center under the custody of the Department of Correction. [Dkt. 45-2 (Local Rule 56(a)(1) Stmt., ¶ 1; Dkt. 51-2 (Local Rule 56(a)(2) Stmt.), ¶ 1]. From 2005 to 2011, on multiple occasions Carter has been discharged, readmitted, and transferred among different correctional institutions. [Dkt. 45-2, ¶ 2; Dkt. 51-2, ¶ 2]. Since March 13, 2012, the DOC has transferred Carter to different correctional institutions a total of 12 times. [Dkt. 45-2, ¶ 3; Dkt. 51-2, ¶ 3]. Carter attended an Inmate Orientation upon each new transfer wherein he received information about certain administrative

remedies and obtained the Inmate Handbook. [*See* Dkt. 45-2, ¶¶ 4-6; Dkt. 51-2, ¶¶ 4-6]. Carter acknowledges the Inmate Handbook explains inmate grievance procedures. [*See* Dkt. 45-4 (Defs.' Ex. B, Carter Dep.), at 12:19-21]. Carter filed inmate grievances prior to 2014. [Dkt. 45-2, ¶ 7; Dkt. 51-2, ¶ 7].

The DOC transferred Carter from MacDougall-Walker Correctional Institution ("MacDougall-Walker") to Cheshire Correctional Institution ("Cheshire") on February 18, 2014. [Dkt. 45-3 (Deveau Aff.), at 63]. A few weeks later on March 6, 2014, Carter became involved in a physical altercation with another inmate. [Dkt. 45-2, ¶ 8; Dkt. 51-2, ¶ 8]. That same day Carter pleaded guilty to fighting and as a result was placed in punitive segregation in the Restrictive Housing Unit ("RHU") for twelve days until March 18, 2014. [Dkt. 45-4, at 14:14-15:2; *see* Dkt. 45-3, at 72].

Upon Carter's arrival in the RHU, a woman identified by the Defendants as Nurse Cheryl Estrom visited his cell, which is captured on video. [Dkt. 45-2, ¶ 13; Dkt. 51-2, ¶ 13]. The video indicates Estrom's visit and examination of Carter for injuries lasted under two minutes. [Dkt. 51-5 (Pl.'s Ex. C, Code Blue Video), at 11:19-end]. Estrom asked Carter to show her his injuries through the hole in the door. Carter presented his left hand and forearm up to his elbow through the hole. *Id.* at 11:50-56. Carter verbally stated his "left arm" was injured but also indicated through physical gesture that he was injured in his hand and wrist region. *Id.* at 12:05-12:13. After making this gesture, Estrom asked him to make a fist with his left hand. *Id.* at 12:14. Carter loosely bent his four fingers into his palm but did not bend his thumb, which remained straight. *Id.* at 12:14-23. Estrom did not ask Carter if he was able to make a fist or to bend his thumb. *Id.* During this evaluation

Estrom looked at but did not palpate Carter's left arm, hand, or wrist. She asked to see "the other arm," but did not ask him to make a fist with his right hand. *Id.* at 12:16-22. Again, Estrom looked at but did not palpate his "other arm." She subsequently completed a Medical Incident Report (Form CN 6602). [Dkt. 45-5 (Defs.' Ex. C, Incident Report), at 39]. Under the "Injury description" box, Estrom wrote in relevant part, "My L arm hurts." *Id.* She wrote under "Observations/remarks," "Wrists neg. L arm no abrasions or contusions. Full ROM[1] of hand, wrist, & elbow. R ear outer aspect ½" round superficial abrasion." *Id.*

### A. *Carter's Experience While Housed in the RHU*

On July 20, 2016, Carter submitted to a deposition by Defendants' counsel in which Plaintiff's counsel did not ask any questions. [Dkt. No. 45-4]. He testified that every single day between March 6, 2014, and March 18, 2014, he told members of the medical staff and correctional officers he had an injury. *Id.* at 16:11-23. Specifically, Carter testified that he told correctional officers Watson, *id.* at 25:7-11, Walker, *id.* at 26:4-10, Guzman, *id.* at 26:13-20, Stewart, *id.* at 26:22-27:9, and Mauvinchi, *id.* at 12-18, about his injury.

Carter also testified that he filed grievances at Cheshire, stating specifically, "[T]here was at least three at Cheshire Correctional because I had to follow the chain of command, so I can't just file the grievances, and I wasn't there long enough to do enough of them." *Id.* at 28:19-29:2. Carter did not testify to the date

---

[1] The Court presumes "ROM" means "range of motion," as indicated in Defendants' Local Rule 56(a)(1) Statement and admitted by Plaintiff in the Local Rule 56(a)(2) Statement. [*See* Dkt. 45-2, ¶ 12; Dkt. 51-2, ¶ 12].

on which he filed these grievances, to whom they were addressed, the type of grievance he filed, or in which box the grievances were placed. Nor did he offer into evidence the receipt or response to any grievance. He only claims to have handed a written *medical request* to Stewart to "put it in the box for medical," *id.* at 26:22-27:1, but otherwise there is no information on the record about exactly how any of the alleged grievances were filed.[2]

Regarding the content, Carter testified that he filed three grievances. First, he claims he filed a grievance claiming he showed an unidentified nurse his injury, told her he was in pain, requested medical treatment, but was not treated. *Id.* at 18:9-14. He testified that he did not receive a response and that he did not appeal the nonresponse because he did not know that he could. *Id.* at 18:15-19. He also testified that he received Inmate Handbooks and orientations describing the grievance process at each facility to which he had been transferred. *Id.* at 10:13-18. Second, he testified that he filed a grievance claiming he informed medical staff that he injured his thumb or hand, but they did not help him. *Id.* at 16:25-17:3. Third, he claims that he told Captain Watson, other correctional officers, or the Deputy Warden that he was in pain due to his thumb injury but the correctional officer failed to get him medical assistance. *Id.* at 19:25-20:6. Carter testified that he did not receive a response to this grievance and did not file an appeal. *Id.* at 20:7-11.

---

[2] The Court surmises that Carter may be synonymously referring to medical requests, inmate request forms, and grievances.

Carter also testified that he never filed a grievance claiming that he asked a correction officer to contact the medical department for him but that his request was ignored. *Id.* at 21:4-8. He admitted that he never filed a grievance claiming he told Ms. Mathews from mental health his thumb was injured and he needed medical attention, but she failed to procure such assistance. *Id.* at 21:22-22:2.

Three months after his deposition on October 21, 2016, Carter signed and submitted an affidavit addressing the time period he spent in the RHU, which contradicts some aspects of his deposition testimony. In it Carter avers facts not included in his deposition testimony. [*See* Dkt. 51-6 (Pl.'s Ex. D, Carter Aff.)]. He states that between March 6, 2014, and March 17, 2014, he wrote six Inmate Request Forms ("CN 9601 Forms") requesting medical treatment and that he gave them to Mulligan, Deko, and other available employees because he did not have access to the boxes to personally submit them. *Id.* ¶ 6. He believes the RHU protocol requires all paperwork to be left on Watson's desk for submission by him. *Id.* ¶ 7. Carter's declaration does not state the reason he did not have access to the grievance deposit box or the provision of the Inmate Handbook of other DOC pronouncement which led him to believe he could file a grievance by leaving it on Watson's desk. Administrative Directive 9.6, Inmate Administrative Remedies, ("Directive 9.6") instead requires all grievances to be "submitted by depositing them in a locked box clearly marked as 'Administrative Remedies'" and that "[t]he Unit Administrator shall ensure that an adequate number of collection boxes are accessible within the facility." [*See* Dkt. 45-13 (Defs.' Ex. J, Administrative Directive 9.6), § 5(C)]. Directive 9.6 also provides that "[a]ny inmate who needs

assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.* at § 5(B)(1).

Carter's affidavit further states that he learned on March 12, 2014, that no medical requests had been submitted on his behalf. *Id.* ¶ 8. On March 17, 2014, he submitted an Inmate Administrative Remedy Form ("CN 9602 Form") as a "written grievance in reference to the lack of response to my requests for medical" and that he handed the form to Deko. *Id.* ¶ 10. He wrote a supplemental letter to Walker about the lack of medical care and also handed it to Deko, although he received no response. *Id.*

Carter offers a statement purportedly authored by Inmate William Jones. [Dkt. 51-11 (Pl.'s Ex. I, Jones Statement)]. The statement is signed but undated and states, "I am writing this statement on my own free will. I attest that nobody forced me to write this statement. I attest that the facts of this statement are true as I remember." *Id.* The statement is neither sworn nor made under penalty of perjury. On a motion for summary judgment the Court may accept only evidence admissible under the rules of Evidence. Fed. R. Civ. P. 56(c); *see Raskin v. Wyatt Co.,* 125 F.3d 55 (2d Cir. 1997); *Welch-Rubin v. Sandals Corp.*, No. 3:03CV481 (MRK), 2004 WL 2472280, at *1-2 (D. Conn. Oct. 20, 2004) (admitting affidavits); *see also Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988) (finding declaration did not properly lay foundation for testimonial document when it merely claimed to the document was a "[t]rue and correct cop[y]"). Rule 56(c) expressly permits the Court to consider affidavits or declarations. Fed. R. Civ. P. 56(c). When, under any United States law or any other rule such as the Federal Rules of Evidence, a matter

is required to be supported by a sworn declaration or an affidavit, the matter alternatively may be proven by the unsworn declaration or statement, subscribed by the maker as "true under penalty of perjury," provided that it is dated and signed and contains substantially the following language: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746. This provision "allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment.

Both Carter's affidavit and Jones's statement were submitted through Carter's attorney. Unlike Carter's affidavit, Jones's statement is inadmissible as it does not substantially comply with 28 U.S.C. § 1746. *Compare Reynolds v. Sealift, Inc.*, 311 F. App'x 422, 245 (2d Cir. 2009) (upholding district court's decision to exclude four unsworn affidavits lacking a precise date) *to LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (acknowledging the letter "substantially complied" when it was signed, dated, and stated, "Under penalty of perjury, I make the statements contained herein"); *Monahan v. NRA Grp. L.L.C.*, No. 3:10-CV-00638 (JCH), 2011 WL 3901877, at *2 n.5 (D. Conn. Sept. 6, 2011) (excluding "affidavit" that was not dated, notorized, or signed under penalty of perjury as it did not meet requirements for sworn affidavit or unsworn declaration). The Court presumes Plaintiff's counsel knows the difference between the two and submitted the most persuasive material in opposition to summary judgment that

he had available. Accordingly, the Court finds that it would be futile to withhold its decision on summary judgment to afford counsel an opportunity to obtain an affidavit or declaration.

## B. _Medical Treatment for Carter's Injury_

The clinical record indicates medical staff attended to Carter on March 14, 2014, eight days after he entered the RHU and was examined by Estrom. There is nothing in the record explaining what prompted this examination.  The record states the following:



[Dkt. 47 (Defs.' Ex. E, Sealed), at 145].[3]  The only written record in evidence of any medical request during his time in the RHU is his request for a mental health consultation documented on March 10, 2014, which does not reference his swollen left thumb or hand.  [_See_ Dkt. 45-2, ¶ 15; Dkt. 51-2, ¶ 15].

Carter's hand was first examined by a physician on March 18, 2014.  On that date he was examined by Dr. Ruez who ordered X-rays, wrapped Carter's left hand in an ACE bandage, and prescribed Motrin for pain.  [Dkt. 45-2, ¶ 16; Dkt. 51-2, ¶ 16].  The X-ray results indicated a fracture on the base of the first metacarpal of his left hand.  [Dkt. 45-2, ¶ 17; Dkt. 51-2, ¶ 17].

On March 19, 2014, the DOC transferred Carter from Cheshire to Corrigan-Radgowski Correctional Center ("Corrigan-Radgowski").  [Dkt. 45-2, ¶ 17; Dkt. 51-

---

[3] All redacted information refers to content appearing in sealed documents that is not otherwise quoted by the Plaintiff.

2, ¶ 17]. One week later on March 26, 2014, the URC reviewed and approved of a request for Carter to receive an expedited orthopedic evaluation of his left hand.[4] [Dkt. 47, at 111]. The URC review form contains a clinician signature and Carter's signature dated April 3, 2014, acknowledging the following: "URC Decision to be Reviewed by Facility MD and Discussed with Inmate Before Filling." *Id.* These signatures indicate that nearly a month after his first complaint, on April 3, 2014, the URC approved the request for Carter to be examined by an orthopedics specialist. [*See* Dkt. 45-2, ¶ 19; Dkt. 51-2, ¶ 19].

More than one week after the URC approval and five weeks after his initial complaint, on April 11, 2014, orthopedics specialist, examined Carter's left hand. [Dkt. 45-2, ¶ 20; Dkt. 51-2, ¶ 20]. He made the following assessment:



I had a long discussion with him explaining that five weeks status post his injury, which <u>could have readily been treated with a closed pinning if we could have gone into it acutely</u>, <u>would be quite a challenging operation due to the small size of the bony fragments, the amount of healing that has already taken place, and the chance that we could comminute even further the small bony fragments or make him worse.</u>

<u>I did explain to him that he could develop arthritis of the thumb carpal metacarpal joint whether we operate on him or whether we do not operate on him,</u>

.

---

[4] The URC request does not make clear who ordered the review.

[Dkt. 47, at 112-13 (emphasis added)].  The orthopedics specialist recommended a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 113.

### C. *Carter's Experience Post-Treatment*

Carter testified that in addition to the grievances filed at Cheshire, he also filed two grievances at Corrigan-Radgowski to address his persistent pain and receive different and more effective pain medication.  [Dkt. 45-2, ¶ 25; Dkt. 51-2, ¶ 25].  The record contains an CN 9601 Form submitted to "Grievance Coordinator" on September 4, 2014, wherein he stated, "I have filed Grievances in Corrigan and in Cheshire for any property being missing by (CO. Viera – Cheshire) and on medical in Cheshire because of my thumb being broken but <u>because</u> they (Cheshire) didn't do anything to fix or help me with the pain for 11 days.  Can you let me know if they are being processed?"  [Dkt. 51-13 (Pl.'s Ex. K, Inmate Request Form 9/4/14), at 2].  Staff King responded, "You must write to that facility.  If you got a receipt for Corrigan I could check on that."  *Id.*  On September 10, 2014, Carter filed another CN 9601 Form with Cheshire stating, "(I have sent a letter) and now I am waiting on a request to see if my (Grievance was processed?)  I don't remember the date but sometime between (March 6th to the 19th.)  [sic] Also, I'm not sure what to do from here because I'm not in the same facility."  [Dkt. 51-15 (Pl.'s Ex. M, Inmate Request Form 9/10/14), at 2].

Carter then filed a grievance on September 20, 2014, by filling out a CN 9602 Form stating he was "unable to get surgery done due to the delay of medical treatment by Cheshire C.I." and that he was "trying to get the pain to go away and

medical isn't doing enough." [Dkt. 54-14 (Pl.'s Ex. L, Grievance), at 3].[5] The grievance indicates it was received on October 5, 2014, and on October 20, 2014, APRN L'Heureux wrote the following: "Discussed trial of <u>Naprosyn</u> x 30 days to ↓ thumb discomfort." *Id.* The nurse did not check either of the two boxes indicating he had exhausted DOC's Administrative Remedies or that the matter could be appealed. *Id.*

Defendants submitted three grievance logs: (1) Cheshire's Directive 9.6 grievance log between February 18, 2014, and March 19, 2014 (the time period Carter was housed at Cheshire), [Dkt. 45-8 (Defs.' Ex. F, Cheshire 9.6 Grievance Log)]; (2) Cheshire's Directive 8.9 grievance log between March 1, 2014 and April 30, 2014,[6] [Dkt. 45-9 (Defs.' Ex. G, Cheshire 8.9 Grievance Log)]; and (3) Corrigan's 9.6 grievance log between March 19, 2014, and June 12, 2015 (the time period Carter

_____

[5] Kimberly Daly, the Administrative Remedies Coordinator at Corrigan-Radgowski, submitted an affidavit stating that she is "the keeper of records of all inmate grievances and grievance appeals, and maintain[s] the grievance log at Corrigan Correctional Institution as set forth in DOC Administrative Directive 9.6 § 6(P) (August 15, 2013)." [Dkt. 45-10 (Defs.' Ex. H, Daly Aff.), at ¶¶ 2-3]. Daly attested that "on July 5, 2016, [she] reviewed records of all grievance filings and grievance appeals at Corrigan Correctional Institute from March 19, 2014 to June 12, 2015. During this period, Inmate Shaquon Carter, No. 335275, did not file any grievances." *Id.* at ¶ 4. The parties dispute whether Carter's filing of the grievance on September 20, 2014, is evidence that Daly's affidavit is misleading or incorrect. The Court notes that CN 9602 Form may be used to file a custodial grievance under Administrative Directive 9.6 or a health services grievance under Administrative Directive 8.9. *See* Dkt. 51-9 (Pl.'s Ex. G, Inmate Requests for Non-Emergency Health Services), at 2; *see generally* Dkt. 45-13]. As Carter's grievance does not specify the type of grievance and there is no evidence showing into which box he submitted the grievance, the Court need not make a determination as to whether the affidavit is misleading or incorrect. In addition, it is not clear that Daly should not have reviewed additional records to determine whether grievances were filed after June 12, 2015, as King's statement indicates that an inmate may file a grievance in which he is no longer housed.

[6] The reason for selecting this time period is unknown to the Court.

was housed at Corrigan), [Dkt. 45-10]. None of these logs contain any grievances filed by Carter during the respective time periods. Notably, these grievance logs would not have documented Carter's informal resolution requests filed through the CN 9601 Forms. [*See* Dkt. 45-13, § 6(P) (stating a grievance log shall be maintained for each "level," but Levels 1-3 do not include informal written requests filed with CN 9601 Forms); Dkt. 45-14, § 13 (requiring an electronic log to be maintained for Health Services Review requests and appeals, which do not include written requests utilizing CN 9601 Forms)].

On June 12, 2015, the DOC transferred Carter again, this time to Enfield Correctional Institution ("Enfield"). [Dkt. 45-3, at 63]. Carter remained at Enfield until recently when he was transferred to Carl Robinson Correctional Institution. [Dkt. 51-2, ¶ 3].

### III. <u>Administrative Directives</u>

Defendants claim that Directive 9.6 applies to Carter's claims against the correctional officers and Directive 8.9 applies to Carter's claims against the medical staff.

#### A. *<u>Directive 9.6</u>*

Directive 9.6 "provide[s] a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority," and it "enables the Department to identify individual and systemic problems, to resolve legitimate complaints in a timely manner and to facilitate the accomplishment of its mission." [Dkt. 45-13, § 1]. First, Directive 9.6

requires an inmate to go through an Informal Resolution process by attempting to resolve the issue verbally with the appropriate staff member or supervisor/manager. *See id.*, § 6(A). Should this effort fail to resolve the issue, the inmate must file a written request by submitting a CN 9601 Form and the response will be administered within 15 days. *See id.* An inmate who is "not satisfied with the informal resolution offered" or who does not receive a timely response may file a grievance by submitting a CN 9602 Form and either (1) attaching the CN 9601 Form and response or (2) explaining why the CN 9601 Form is not attached. *Id.*, § 6(C). The Directive does not require the CN 9602 Form to be accompanied by a receipt for the CN 9601 Form.[7] *See id.* The Unit Administrator shall then make the Level 1 Review decision within 30 days, and after this date the inmate may appeal for Level 2 Review any denial, rejection, or failure to timely respond. *Id.*, § 6(C), (I), (K). Within 30 days the District Administrator shall render a decision, which exhausts the administrative process for all grievances except those challenging (1) Department level policy, (2) the integrity of the grievance procedure, or (3) timeliness of the decision. *Id.*, § 6(L). Any disposition regarding these three exceptions may be appealed to the Commissioner or a designee for Level 3 Review. *Id.*

Section 5(C) provides that all grievances and appeals must be placed in an Administrative Remedies box to be collected by the Unit Administrator, and there

---

[7] Directive 9.6 requires the Administrative Remedies Coordinator to "complete and forward CN 9603 Administrative Remedy Receipt to the inmate and place a copy of the receipt in the appropriate file." *Id.*, § 5(D)(5). The record does not contain a copy of the CN 9603 Receipt, and as such the Court cannot determine to which stage of the remedy process the Receipt applies.

are to be "an adequate number of collection boxes . . . accessible within the facility." Furthermore, the Administrative Remedies Coordinator shall "ensure that current administrative remedy forms are available in all housing units." *Id.*, § 5(D)(2).

In addition to the grievance procedure, Directive 9.6 also provides that "[e]ach inmate in the Department's custody shall have access" to the Directive and that "[a]ny inmate who needs assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.*, § 5(B)(1).

## B. *Directive 8.9*

Administrative Directive 8.9, Administrative Remedy for Health Services ("Directive 8.9") "establish[es] a Health Services Review procedure as the administrative remedy for all health services to enable an inmate to seek formal review of any health care provision, practice, diagnosis or treatment," which thereby "enables the Department to identify individual and systemic problems, to resolve health care issues in a timely manner and to facilitate the accomplishment of its mission." [Dkt. 45-14 (Defs.' Ex. L, Directive 8.9), § 1]. First, "[t]he inmate must attempt to resolve the issue face to face with the appropriate staff member or with a supervisor via written request utilizing CN 9601 Inmate Request Form." *Id.*, § 10. If after 15 business days of receiving the written request a response is not made, an inmate may then file a CN 9602 Inmate Administrative Remedy Form for further review. *See id.* Depending on whether the inmate seeks review of (1) a diagnosis or treatment, or (2) an administrative issue, different procedure follows.

Under § 11 of Directive 8.9, an inmate may seek review of a *diagnosis or treatment* as outlined in § 9(A) and file a CN 9602 Form to "apply for a Health Services Review if informal resolution via inmate request was unsuccessful." *Id.* A possible result from filing a CN 9602 Form is that the case may be referred to the Utilization Review Committee that engages in the "process by which requests for specialty care, treatment, services, and/or diagnostic testing is reviewed for approval based on standardized guidelines." *Id.*, § 3(K). Directive 8.9 does not contain a statute of limitations for filing a CN 9602 Form under this provision.

In addition to § 11 of Directive 8.9, § 12 provides a process for inmates seeking "review of a *practice*, *procedure*, *administrative provision* or *policy*, or an allegation of *improper conduct* by a health services provider" under § 9(B). *Id.*, § 12. Like the policy under § 11, an inmate may submit a CN 9602 Form. *Id.* "The inmate should provide a concise statement of what he/she believes to be wrong and how he/she has been affected." *Id.* The HSR Coordinator must evaluate, investigate, and decide the request for review within 30 days. *Id.*, § 12(A). If dissatisfied, the inmate may appeal within 10 business days by completing a CN 8901 Appeal of Health Services Review Form and placing it into the Health Services box.[8] *Id.*, § 12(B). A contracted health services provider will then decide the appeal within 15 days. *Id.*, § 12(C). If the appeal pertains to compliance, the provider's decision exhausts the health services review process. *Id.*, § 12(C). If the appeal pertains to a health services policy of the Department, the inmate may then appeal

---

[8] Unlike Directive 9.6, Directive 8.9 does not provide an opportunity to appeal as a matter of course should the Coordinator fail to respond within the 30 days.

to the DOC Director of Health Services within 10 business days of receipt of the provider's decision, who must respond within 30 days of receipt of the appeal. *Id.*, § 12(D). The decision of DOC Director of Health Services renders the inmate's review process exhausted. *Id.*


## IV.  Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A plaintiff opposing summary judgment "cannot defeat the motion by relying on the allegations in his pleading . . . or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*

*v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of [his] allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.*, 2004 WL 2472280, at *1 (citing *id.* at 518); *see Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). In other words, a party opposing summary judgment must produce more than "a 'scintilla of evidence,'" i.e., the evidence must be sufficient for "'a jury to properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251–52). In asserting a genuine dispute of material fact a party may cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4). Upon the production of such evidence, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

## V. Discussion

Defendants argues that Carter failed to exhaust his administrative remedies before filing suit. Defendants also argue that summary judgment be granted in favor of Jane Does 1-7, Dr. Revine, and Lieutenant Mauvinchi as they have not yet been properly identified or served. The parties do not address the merits of the deliberate indifference claim.[9]

### A. *Exhaustion of Administrative Remedies*

Section 1997e of Title 42 of the United States Code governs actions brought by prison inmates. This section provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This subsection applies to all claims regarding prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Section 1997e requires exhaustion of any available administrative remedies, regardless of whether they provide the relief the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim is not exhausted until the inmate complies with all administrative deadlines and procedures. *See Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Informal efforts to put prison officials on

---

[9] The Court will not address the merits of the deliberate indifference claim as Carter did not have notice that he had to come forward with all his evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Pugh v. Goord*, 345 F.3d 121, 145-25 (2d Cir. 2003) (opining that summary judgment is never appropriate "where no party has moved for summary judgment and no notice was given by the court").

notice of inmate concerns do not satisfy the exhaustion requirement. *See Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court. *See Woodford*, 548 U.S. at 95.

The exhaustion requirement, however, may be excused when the remedy is not available in practice even if it is "officially on the books." *See Ross v. Blake*, 136 S. Ct. 1850, 1858-59 (2016); *Harvin v. Chapdelaine*, No. 3:16-cv-1616 (VAB), 2016 WL 7197363, at *1 (D. Conn. Dec. 9, 2016) (same). This means that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). The United States Supreme Court has established three circumstances under which an inmate need not exhaust the administrative procedure as it is deemed unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a procedure is "so opaque that it becomes, practically speaking, incapable of use;" or (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60; *see Williams v. Ford*, No. 3:14-cv-1181 (VAB), 2017 WL 1025661, at *4 (D. Conn. Mar. 16, 2017).

"Whether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (determining

that the applicability of the *Ross v. Blake* "unavailability" exceptions lies "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate."). The failure to exhaust administrative remedies under 42 U.S.C. § 1997e is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 215 (2007) (ruling an inmate need not specially plead or demonstrate exhaustion in the complaint); *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999) (same). As such, "defendants bear the initial burden of establishing, by pointing to legally sufficient source[s] such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs*, 788 F.3d at 59; *see Johnston v. Maha*, 460 F. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."); *Michalski v. Corr. Managed Health Care*, No. 3:15-cv-571 (VAB), slip op. at 2 (D. Conn. Oct. 21, 2016) ("Thus, defendants have the burden of proving that [plaintiff] has not exhausted claims prior to filing this action."). Defendants have not waived this affirmative defense as they list the failure to exhaust as the Second Affirmative Defense in their Answer to the Second Amended Complaint. [Dkt. 37 (Ans. to Second Am. Compl.), at 6].

Carter has filed claims against correctional staff and medical staff. Defendants posit that the former are subject to exhaustion requirements under Directive 9.6, and the latter are subject to exhaustion requirements under Directive 8.9. [Dkt. 45-1, at 9]. Carter does not address Directive 8.9, but rather that Directive 9.6 generally addresses the grievance process. [Dkt. 51-1, at 14-16]. Below the Court will separately address each Directive pertinent to the type of staff.

### 1. *Correctional Officers*

Defendants argue that Carter failed to exhaust his Directive 9.6 administrative remedies to grieve the correctional officer Defendants' alleged failure to assist him in obtaining treatment for his hand. [*See* Dkt. 45-1, at 9 (citing Directive 9.6 § 4(A))]. In support of their argument, Defendants submitted Directive 9.6 grievance logs for the following: (1) Cheshire's Directive 9.6 grievance log between February 18, 2014, and March 19, 2014 (the time period when he was housed at Cheshire); and (2) Corrigan's Directive 9.6 grievance log between March 19, 2014 and June 12, 2015 (the time period when he was housed at Corrigan). [*See generally* Dkt. 45-8; Dkt. 45-9; Dkt. 45-10]. The grievance logs indicate that Carter did not file any grievances with the respective institutions during these time periods.[10] Moreover, the Administrative Remedies Coordinator is required to "complete and forward CN 9603 Administrative Remedy Receipts to the inmate and place a copy of the receipt in the appropriate file," [Dkt. 45-13, § 5(D)(4)], but there are no such receipts in evidence.

Carter does not dispute in his summary judgment briefing that Directive 9.6 is the appropriate procedure for his claims against the correctional officers, and

---

[10] The record does not indicate whether and how an inmate housed at Corrigan could file a grievance involving conduct that occurred at Cheshire. This missing procedural evidence is somewhat significant as Carter was transferred from Cheshire to Corrigan on March 19, 2014, and this date precedes the 15-day deadline when he would have received a response to his CN 9601 Form (assuming he filed a CN 9601 as early as March 6, 2014). However, Carter does not allege in the Second Amended Complaint he was unable to or prevented from filing subsequent grievances at Corrigan about events occurring at Cheshire. He also did not testify that he filed a grievance directed to Cheshire while housed at Corrigan. The Court thus finds the submitted grievance logs sufficient.

he does not dispute that he failed to exhaust remedies as outlined under Directive 9.6. Indeed, Carter testified that he submitted a grievance against correctional staff for failing to get medical assistance when he notified them he was in pain due to his thumb injury, but he never received a response and he never appealed the nonresponse. [Dkt. 45-4, at 19:25-20:11]. Carter also admits that he never filed a grievance against correctional staff for ignoring his request to contact the medical department on his behalf. *Id.* at 21:4-8. Rather, Carter argues that he could not have exhausted his claims because he never received a response to his grievances, he was transferred to a different facility during the 30-day time period, and there is evidence of his grievances. [*See* Dkt. 51-1, at 14-15].

The Court cannot render summary judgment for the Defendants on the basis of their contention that Carter did not file grievances when Carter claims that he did. These conflicting factual scenarios create the classic genuine issue of material fact. This is especially true where, as here, the Defendants had reason to know that the delay in treatment caused Carter harm, creating a motivation to conceal the grievances. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *Home Assurance Co.*, 446 F.3d at 315-16.

### a. Remedy So Opaque It Is Incapable Of Use

Assuming Carter filed the grievance, he was required to appeal the nonresponse. [*See* Dkt. 45-13, § 6(l) ("If a response to a Level 1 grievance is not received within 30 business days, an inmate may appeal to Level 2.")]. But an inmate need not exhaust an administrative remedy that is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859. Carter

alleges that his transfer on March 19, 2014, prevented him from exhausting his remedies because he never received a response. [Dkt. 51-1, at 14-15]. The Second Circuit in *Williams v. Corr. Officer Priatno*, 829 F.3d at 126-27, addressed this very issue with respect to the transfer policy at the New York Department of Corrections and Community Supervision ("DOCCS"). The DOCCS provided that where "the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* at 126 (quoting N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.6(h)(2)). The plaintiff in that case never received a response to his grievance filed before his transfer, and the Second Circuit determined that "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* In ruling that the procedures available to the plaintiff were "practically speaking, incapable of use," the Second Circuit recommended that the DOCCS "revise its grievance procedures to instruct inmates . . . how to appeal a grievance, to which the inmate never received a response, after being transferred." *Id.* at 127. Here, the DOC does not set forth any policy whatsoever instructing inmates on how to navigate the grievance process upon a transfer. This is even more "incapable of use" than the DOCCS's opaque process.

Of note, Carter submitted a CN 9601 Form at Corrigan wherein he stated, "I have filed grievances in Corrigan and in Cheshire . . . because of my thumb being broken but <u>because</u> they (Cheshire) didn't do anything to fix or help me with the pain for 11 days." [Dkt. 51-13, at 1]. Staff King responded, "You must write to that

facility." *Id.* While the statement suggests the appeal process could be conducted by mail, such a process is not set forth in any directive in the record and therefore *Williams* is instructive. Directive 9.6 only allows an appeal to be filed by placing it in the "Administrative Remedies" box. [Dkt. 45-13, § 5(C)]. King's instruction raises the potential that Carter was "thwart[ed] from taking advantage of a grievance process through machination [or] misrepresentation," *Ross*, 136 S. Ct. at 1860, as King's direction contradicts the procedure found in Directive 9.6.

Furthermore, given that Carter was housed in the RHU and claims to have had no access to the appropriate grievance box, [Dkt. 51-6, ¶ 6], the absence of his grievance in the grievance log raises the potential that a correctional officer never filed the claim. The Second Circuit also addressed this situation in *Williams.* While in segregation on January 15, 2013, the plaintiff drafted a grievance about an assault he allegedly suffered by several correctional officers, and he asked a correction officer to give it to the grievance office in accordance with the DOCCS grievance procedures for inmates housed in the SHU. *See id.* at 120-121, 124 ("Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk.") (citing NYCRR, tit. 7, § 701.7). A week later, the plaintiff notified superintendent Ada Perez visiting the SHU that he had not received a response, upon which she stated she would look into the situation. *Id.* at 121. About one week after that, the plaintiff was transferred to a different facility prior to receiving a response. *Id.* The defendants cited the DOCCS regulation enabling an inmate to appeal a grievance when he does not receive a timely response, arguing that this process was

available "even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility prior to receiving a response." *Id.* at 124. The Second Circuit determined that "the regulations give no guidance whatsoever to an inmate whose grievance was *never* filed," *id.* at 124 (emphasis added), and noted that the plaintiff would not have had the right to appeal his grievance until after the time for the superintendent to respond had passed, which was after the filing deadline for his initial grievance. *See id.* at 125. As such, the Second Circuit held that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (applying *Ross*, 136 S. Ct. at 1859).

Were this circumstance to be the case, Directive 9.6 suffers from the same shortcomings as those of the DOCCS: there is no procedure for grievances that are not filed as a result of a correctional officer failing to assist the inmate in the grievance process despite being so required. [*See* Dkt. 45-13, § 5(B)(1)]. Directive 9.6 provides that "[a]ny inmate who needs assistance in using the Inmate Administrative Remedies Process shall receive assistance upon request." *Id.* § 5B(1). Inmates in the RHU are housed in a locked cell for 23 hours each day and have limited access to common areas. Neither the Directive nor any other evidence presented by the Defendants establish that inmates housed in the RHU have access to grievance forms. The Administrative Directives here make no mention of the manner in which an inmate in the RHU or an inmate who has been transferred is to file a grievance, and thus provide no guidance to an inmate in either of these instances.

Unlike the Defendants, Carter has provided sufficient evidence for the Court to conclude he tried to submit the grievance by and through the assistance of correctional officers while he was housed in the RHU. Carter testified that he gave a medical request to Stewart. [*See* Dkt. 45-4, at 26:22-27:1]. Carter's affidavit mentions submitting to correctional officers Mulligan, Deko, and "other available employees" six medical requests and a "written grievance in reference to the lack of response to my requests for medical care." [Dkt. 51-6, ¶¶ 6, 10]. Such evidence is sufficient for the Court to conclude that it was practically impossible to pursue his grievance. *See Williams*, 829 F.3d at 123; *see also Hubbs*, 788 F.3d at 54 (establishing that the availability of an administrative remedy is a question of law for the courts, even if there are factual elements).

As Carter testified, he notified staff of his injury every single day, [Dkt. 45-4, at 16:11-16], but the DOC failed to facilitate his treatment for 11 days. When he finally did begin to receive treatment, the process took several weeks and he was ultimately informed that the delay caused him to sustain an avoidable permanent disability. [Dkt. 47, at 112 (wherein the orthopedics specialist "explain[ed] to him that he could develop arthritis of the thumb carpal metacarpal joint whether we operate on him or whether we do not operate on him")]. The delay in treatment and the potentially irreversible nature of Carter's resulting disability combined to render the grievance process unavailing. The test of whether an administrative remedy is available to an inmate is an objective one: that is, would "a similarly situated individual of ordinary firmness have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004), *abrogated on other grounds*. After

Carter's treatment began, it would have been reasonable for him to have abandoned any grievance process and he would have reasonably believed his needs were being met.

After the onset of treatment, Carter no longer had a basis to pursue a grievance. His request was no longer being honored, he did not know his thumb had been broken and he did not know that the delay in treatment had caused his hand to heal improperly causing him a permanent injury. As a consequence the grievance process was of no benefit to Carter or to the DOC because they were aware of the delay and its result. *See Ross*, 136 S. Ct. at 1859 ("When rules are so confusing that . . . no reasonable prisoner can use them, then they're no longer available.") (internal quotation marks omitted).

Defendants submitted in their Reply brief an affidavit by Brian Viger, Deputy Warden for Operations at Cheshire, who stated:

> [A]n Inmate Request Form or a Grievance received claiming a correction officer <u>failed to respond to a request for medical assistance would result in an immediate investigation of the incident,</u> to include the welfare of the inmate and the conduct of the correction officer. If the investigator determined the inmate was in need of medical assistance, such assistance would be rendered by the prison medical unit. If the investigator determined the correction officer failed to furnish medical assistance, the staff member would be subject to discipline.

[Dkt. 57-2 (Defs.' Ex. O, Viger Aff.), ¶ 3 (emphasis added)]. This response presupposes that the claim he had access to the forms, access to filing grievances, and was not thwarted from filing such grievances due to his housing in the RHU or his transfer. Unlike the procedures for New York; *Williams*, 829 F.3d at 126 (quoting N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.6(h)(2)); Defendants

point to no evidence that Connecticut's inmate grievance procedures directly address the manner by which an inmate housed in the RHU can file a grievance and the Court has not found any. Defendants have offered no evidence to support this assertion that Carter's claims that he was denied treatment would have been investigated. Indeed, it was a doctor engaged by the DOC who concluded that Carter's broken hand was not treated in a timely manner. Defendants offer no evidence of an investigation into the reason why. Therefore, the Court finds the hypothetical response to such a grievance to be unavailing here.

### b. Remedy Thwarted for Machination, Misrepresentation, or Intimidation

Other evidence on the record raises the issue as to whether Carter was "thwart[ed] . . . from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860. When Carter submitted the CN 9601 Form to "Grievance Coordinator" on September 4, 2014, to ask about the processing of his prior grievances from Cheshire, Staff King responded, "You must write to that facility. If you got a receipt for Corrigan I could check on that." [Dkt. 51-13, at 2]. An administrative remedy is unavailable "if prison officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it." *Angulo v. Nassau Cty.*, 89 F. Supp. 3d 541, 552 (E.D.N.Y. 2015) (quoting *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011)). *See Ross*, 136 S. Ct. at 1860 ("[I]nterference with an inmate's pursuit of relief renders the administrative process unavailable."); *Brownell v. Krom*, 446 F.3d 305, 312 (2d Cir. 2006) (finding that plaintiff's decision to abandon

his reimbursement claim and pursue the grievance, which foreclosed his ability to appeal, justified his failure to exhaust remedies as it was "directly traced to a prison official's advice to [plaintiff] to follow that course"); *Davis v. Fernandez*, 798 F.3d 290, 296 (5th Cir. 2015) (reversing and remanding grant of summary judgment where jail staff told plaintiff that he could not appeal and plaintiff relied on this representation); *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013) ("Remedies that are not reasonably communicated to inmates may be considered unavailable for exhaustion purposes."); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1323 (11th Cir. 2007) (finding it impermissible for "jails and prisons to play hide-and-seek with administrative remedies"); *Robinson v. Ballard*, No. 9:13-CV-01213 (TJM/TWD), slip op. at 11 (N.D.N.Y. Feb. 3, 2017) (finding a triable issue of fact where inmate conscientiously pursued a response to his grievance but received "total silence" to his multiple inquiries about the status of his grievance).

Directive 9.6 does not mention mailing a grievance and it does not state that an inmate must have a receipt to follow-up on a pending grievance. [*See* Dkt. 45-13, § 5(D)(5) (identifying CN 9603 as an Administrative Remedy Receipt)]. It only requires the Administrative Remedies Coordinator to "ensure that current administrative remedy forms are available in all housing units." *Id.*, § 5(D)(2). The Directive merely states a grievance is to be placed in a box. *Id.*, § 5(B)(1). It is unclear from the record, how an inmate would obtain a receipt after placing a grievance in a box. *See id.*, § 5(D)(5) (failing to specify how an inmate would successfully receive the forwarded CN 9603 Receipt and failing to indicate whether this Receipt is applicable to the instant situation).

Further, Directive 9.6 suggests that there is no receipt issued at this stage, as it states that when an inmate does not get a response to a CN 9601 Form he may file a CN 9602 Form stating that he did not receive a response.  *See id.*, § 6(C).  The inmate is not required to submit a receipt for the CN 9601 Form.  *Id.*  Nor do the administrative directives state a grievance must be filed in the facility where the incident occurred.  The latter requirement would render the grievance process unavailing to Carter after he was transferred, because he could not deposit the grievance in the box located in a housing unit in which he was not housed.  Contrary to King's instruction, Directive 9.6 suggests that DOC staff should transmit a grievance to the appropriate official.  *See id.*, § 6(A) (while the CN 9602 Form procedure is silent on this issue, with respect to all CN 9601 Forms "[t]he Unit Administrator shall ensure that inmate request forms are collected and delivered in a timely manner.").  Despite this Directive Staff King failed to transmit Carter's grievance and instead told Carter to file his request with the appropriate facility.  King also stated that he could only help if Carter produced a receipt.  To the extent King misinformed Carter, and it appears he or she might have, the grievance process was unavailable to Carter and he is excused from exhausting it.

The procedural ambiguity Carter faced was exacerbated by the existence of a parallel process for medical staff.  In addition to the grievance process, there was also a medical review process, both of which used the same forms.

### 2. *Medical Staff*

Defendants posit that Directive 8.9 provides the applicable administrative remedy for Carter's allegations against medical staff as its purpose is "for all health

services to enable an inmate to seek formal review of any health care provision, practice, diagnosis or treatment" and to identify "individual and systemic problems." [Dkt. 45-14, § 1; *see* Dkt. 45-1, at 9]. Carter addresses only Directive 9.6 as to his grievances against medical staff. [Dkt. 51-1, at 14]. The Court will address both Directives as it is Defendants' burden to prove Carter failed to exhaust his administrative remedies. *Hubbs*, 788 at 59.

### a. Directive 9.6

The Court agrees with the Defendants that only Directive 8.9 applies to Carter's claims against medical staff. Directive 8.9 provides "formal review of any health care provision, practice, diagnosis or treatment," [Dkt. 45-14, § 1], whereas Directive 9.6 more generally applies to "any aspect of an inmate's confinement that is subject to the Commissioner's authority," [Dkt. 45-13, § 1]. Additionally, the mere fact that Directive 9.6 sets forth the Inmate <u>Grievance</u> Procedure is instructive as health care reviews would not fall in this camp. Therefore, the Court finds only Directive 8.9 applies to Carter's medical claims.

### b. Directive 8.9

Carter raises allegations of medical staff's failure to treat Carter while he was housed in the RHU. Section 11 of Directive 8.9 applies to the failure to treat an inmate in the first instance, because the Review of a Diagnosis or Treatment includes "a decision to provide no treatment. . . ." [Dkt. 45-14, § 9(A)]. When Carter was first placed in the RHU on March 6, 2014, Estrom performed a cursory evaluation wherein she did not palpate his hand or compare the left hand to the

right hand.  [Dkt. 51-5, at 12:05-22].  Eight days later on March 14, 2014, a medical staff documented that ████████████████████████████████████████ ████████████████████████  [Dkt. 47, at 145].   To the extent that these evaluations led nowhere, Carter certainly had the ability to seek review of the non-diagnosis or non-treatment under Directive 8.9.  In fact, the record suggests that he was eventually able to obtain a review through this process.  Carter's affidavit indicates that he submitted six medical requests from March 6 to March 17, and he was able to see a physician on March 18, 2014.  [Dkt. 51-6, ¶¶ 6, 11].  ████████████ ████████████████████████████████████████████████ [Dkt. 54, at 23]. Directive 8.9 provides for a URC review only in the context of filing a Review of a Diagnosis or Treatment.  Therefore, Carter must have sought and obtained review of his non-diagnosis or non-treatment as he eventually received adequate medical attention from an orthopedics specialist.  *Id.* at 24.

As it appears Carter successfully navigated through this process and obtained favorable results, he has exhausted his administrative remedies on this issue but can no longer demonstrate that he has standing and falls subject to mootness.  Standing requires "(i) an injury in fact (ii) that is fairly traceable to the defendant and (iii) that is likely to be redressed by a favorable decision." *Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) (addressing standing in a class action PLRA case); *Manon v. Albany Cty.*, No. 11-CV-1190 (GTS/CFH), 2012 WL 6202987, at *7-8 (N.D.N.Y. Oct. 9, 2012) (dismissing inmate's PLRA claim on lack of standing and mootness because the plaintiff "sought no specific relief related to an identifiable harm"); *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 90 (S.D.N.Y. 2013)

(addressing Article III standing in a PLRA case). "[T]he mootness doctrine ensures that the occasion for judicial resolution established by standing persists throughout the life of a lawsuit." *Amador*, 655 F.3d at 99-100. On the limited issue of Carter seeking review of the medical staff's failure to diagnose or treat him, "the claim has been rectified" by his path through the process and the resulting orthopedics specialist consultation; Carter no longer has an injury to grieve. *See id.* The Court thus GRANTS summary judgment in favor of Defendants on this issue.

What Carter does not address is the fact that it took a total of 36 days from the date Estrom performed her initial evaluation to the date he finally saw a specialist. Notably, on March 18, 2014, the same day Carter received his X-rays, a ███████████████████████████████████████████████. [Dkt. 47, at 111]. ███████████████████████████████████████████. *Id.* It was not until March 26, 2014 (8 days later), that the URC evaluated the case and approved of the request. *Id.* On April 3, 2014, (8 days later), Carter received the approval and signed the form, which was the last stage before he could see the specialist. *Id.* It took another 8 days before the specialist finally evaluated him on April 11, 2014.

The orthopedics specialist determined on April 11, 2014, that Carter had already healed too much to operate on him without risking a worse condition. [*See* Dkt. 47, at 112 (finding that "five weeks status post his injury, which could have

---

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████

readily been treated with a closed pinning if we could have gone into it acutely, would be quite a challenging operation due to the small size of the bony fragments, the amount of healing that has already taken place, and the chance that we could comminute even further the small bony fragments or make him worse")].  He opined that Carter could develop arthritis whether or not he elected the operation available to him as of April 11, 2014.  *Id.*  The record does not establish how soon after his injury Carter would have had to be diagnosed in order to receive proper treatment.

Should Carter want to grieve the delay in treatment as the reason for his permanent injury and lasting pain, Directive 8.9 § 12 is the appropriate provision to remedy Carter's specific situation.  It does not appear that Carter has sought an administrative remedy for the length of time it took to complete the ████████ ███ process.  Thus, Carter has not exhausted his administrative remedy on this issue.  Once treatment initiated, Carter reasonably withheld from filing any grievance about the long duration of the process, particularly since he did not learn how he would be impacted until he finally saw the orthopedics specialist.  It is unclear at what point Carter had healed too much to be properly treated, but what is clear is that time was of the essence.

Carter is not precluded from initiating the process now because Directive 8.9 contains no statute of limitations for the initial filing of a Review of an Administrative Issue.  [*See* Dkt. 45-14, §§ 10, 12 (requiring only that the DOC staff respond to inmates within a specific time period)].  This is in stark contrast to the 30-day statute of limitations imposed on the grievance process under Directive 9.6.

[Dkt. 45-13, § 6(C) ("The grievance must be filed within 30 calendar days of the occurrence or discovery of the cause of the grievance.")]. Therefore, to the extent that Carter seeks redress for this issue he may file a Review of an Administrative Issue pursuant to Directive 8.9, § 12.

The Court points out that inmates seeking non-emergency medical attention may also be required to sign up for sick call using CMHC Form HR 901, Cell Block - Sick Call Sign Up. [*See* Dkt. 51-9, at 2]. Generally, any inmate who signs up for sick call "more than two consecutive times without resolution of the same complaint and who has not seen a physician/APRN/PA" shall receive an appointment. The record is unclear as to whether Carter's description—that he submitted to correctional officers "medical requests"—actually refers to sick call sign ups. Carter should have been given access to this resource. To the extent he attempted to file sick call requests but was prevented from doing so or if he was not treated after filing sick call requests on two consecutive days as he claims, Carter may also raise this issue by filing a Review of an Administrative Issue pursuant to Directive 8.9, § 12.

The Court therefore GRANTS summary judgment as to the presently named medical staff on the grounds that (1) Carter does not have standing for Estrom and other medical staff failing to diagnose him as he subsequently obtained treatment; and (2) Carter has not exhausted his administrative remedies under Directive 8.9, § 12 for his claims that medical staff failed to respond to medical requests as required or that their response was unduly delayed. Regarding the latter claim, summary judgment is GRANTED without prejudice.

**B.** *Dismissal of Claims Against Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi*

Defendants seek summary judgment as to Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi who currently are either unidentified or improperly identified.  As the Court has granted summary judgment in favor of Defendants as to the medical staff, Carter only seeks leave to amend the Second Amended Complaint to replace the now known Lt. Mauvinchi with Matuszczak.  [*See* Dkt. 51-1, at 3-8; Dkt. 52 (Mot. Amend), at 1-2].  Carter agrees to remove Jane Does 2-7 from the Second Amended Complaint.  [Dkt. 52, at 2].  To the extent that the Second Amended Complaint names Jane Does 1-7, Dr. Revine, and Lt. Mauvinchi, the Court hereby GRANTS summary judgment in favor of these Defendants as Carter does not seek to keep these names listed in the case caption.  The Court will now address Carter's Motion to Amend the Second Amended Complaint to add Matuszczak to the case.

Leave to amend is to be given freely "when justice so requires," Fed. R. Civ. P. 15(a), unless the moving party acted with "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed," or the amendment would create undue prejudice to the opposing party" or be futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However, "where the proposed amendment seeks to add new parties, Fed. R. Civ. P. 21 governs." *Jones v. Smith*, No. 9:09-cv-1058 (GLS/ATB), 2015 WL 5750136, at *25 (N.D.N.Y. Sept. 30, 2015); *see* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just term, add . . . a party.").  Such a distinction is a mere technicality as "the

same standard of liberality applies under either Rule." *Duling v. Gristede's Operating Corp.*, 265 F.R.D. 91, 96-97 (S.D.N.Y. 2010); *Faryniarz v. Ramirez*, 62 F. Supp. 3d 240, 249 n.4 (D. Conn. 2014) (same); *Brown v. Tuttle*, No. 3:13 CV 1444 (JBA), 2014 WL 3738066, at *2 n.5 (D. Conn. July 30, 2014) (same in a prisoner's civil rights case). When there exists a scheduling order, the lenient standard of Rule 15(a) "must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003); *Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012).

The Second Circuit has "referred to the prejudice to the opposing party resulting from a proposed amendment as among the 'most important' reasons to deny leave to amend." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citation omitted). "Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Id.*, 626 F.3d at 725–25 (internal quotation marks and citation omitted). A court may find an amendment to be prejudicial in circumstances where discovery has been completed and the case is near or on the eve of trial. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) (affirming denial of motion to amend, which asserted new claims about a different time period, as "especially prejudicial given the fact that discovery had been completed and [the defendant] had already filed a motion for summary judgment"); *Braham v. Perelmuter*, No. 3:15CV01094 (JCH), slip. op. at 3 (D. Conn.

Nov. 23, 2016) (denying leave to amend after complaint to add parties and add facts and ordering inmate to respond to the motion for summary judgment).  However, a court is not required to deny the motion to amend even if at a later stage of the litigation, particularly where the amendment "seek[s] to insert or correct matters about which parties should have known but did not know," as these matters are "plainly within the scope of Rule 15(a)."  *Hanlin v. Mitchelson*, 794 F.2d 834, 841 (2d Cir. 1986).

Defendants give two reasons why the Court should not grant leave to amend. First, Defendants claim opposing counsel was "dilatory in discovering the identities of these defendants" as counsel waited until May 24, 2016, to first seek discovery and Defendants provided evidence with information that clearly identified Matuszczak.  [Dkt. 58 (Opp'n Mot. Amend), at 4].  Exhibit C contains an Incident Report written by Matuszczak about the event on March 6, 2014, and Carter's placement in the RHU.  [Dkt. 58-3 (Defs.' Opp'n Mot. Amend Ex. C, Incident Report), at 7].  Second, Defendants argue that the proposed amendment is futile because Matuszczak has not been served in accordance with Fed. R. Civ. P. 4(m) and counsel cannot show good cause for failure to comply.  *Id.* at 5.

Carter avers that Defendants sent over 300 pages of discovery on July 25, 2016, just five days before the end of discovery.  [Dkt. 59 (Reply to Opp'n Mot. Leave Amend), at 4].  In addition, Carter submitted Walker's responses to his requests for production, requesting "[a] list of all employees assigned to CCI between March 6, 2014 and March 19, 2014, including but not limited to, correctional officers, nurses, physicians, and any other medical personnel subcontracted to provide medical

service or transportation to inmates for medical purposes." [*See* Dkt. 51-7 (Pl.'s Ex. E, Request for Production), at 9].   Walker objected, claiming the request was "overly broad and not proportional to the needs of the case," *id.*, but there is no indication that Carter filed a motion to compel or attempted to resolve the discovery dispute in any other way.   Carter argues that Defendants are not prejudiced by an amendment to the complaint because he does not seek to add additional counts or facts, and Defendants had notice upon filing of the original complaint. [Dkt. 59, at 7 (citing *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 35 (2d Cir. 1996))].

The Court finds that the Defendants will not be prejudiced by granting leave to amend the Second Amended Complaint.   Indeed, the identities of Matuszczak became apparent to both parties during discovery and the Court does not find that the three-month delay, wherein Carter also had to review the discovery, constituted an "undue delay."   The number of medical staff and correctional staff assigned to the RHU between March 6 and March 18, 2014, is decidedly limited.   The DOC and defense counsel certainly had the ability to discover which personnel accessed the RHU during this period.    Moreover, Defendants had a duty to disclose nonprivileged relevant matter proportional to the needs of the case, Fed. R. Civ. P. 26(b)(1), and take "reasonable steps to preserve" electronically stored information in their possession and control, Fed. R. Civ. P. 37(e), which encompassed documents revealing the identities of people with access to Carter while in the RHU.   The Court instead is persuaded that "[t]he better view is that the [result of this] order merely substitutes equivalent parties, different in name but identical in fact."  *Arthur v. Nyquist*, 573 F.2d 134, 140 (2d Cir. 1978) (allowing board members

to be added as parties after trial closed in a civil rights class action suit under 42 U.S.C. § 1983).

VI.  <u>Conclusion</u>

For the aforementioned reasons, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment and GRANTS Plaintiff's Motion for Leave to Amend to add Matuszczak as a defendant.

The parties are directed to consider settlement positions and within 21 days of the date of this order to contact Magistrate Judge Robert Richardson to schedule a settlement conference.   The parties are encouraged to consider and, if appropriate, timely engage in settlement discussions as the schedule will not be modified to accommodate settlement.

Should the parties determine that settlement is not appropriate, the Court hereby ORDERS Defendants to file supplemental briefing as to the remaining Defendants regarding the merits of Carter's claims within 21 days of the date the parties' decision or 42 days after the date of this order, whichever is earlier. Plaintiff shall file his response within 21 days of the Defendants' filing.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: May 15, 2017